# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| KEITH SNYDER, SUSAN MANSANAREZ, and TRACEE A. BEECROFT, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. BANK N.A., WILMINGTON TRUST, N.A., CITIBANK, N.A., and DEUTSCHE BANK NATIONAL TRUST COMPANY, individually and in their Capacities as Trustees,<br><br>Defendants. | Case No. 1:16-cv-11675<br><br>**CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiffs Keith Snyder, Susan Mansanarez, and Tracee A. Beecroft ("Plaintiffs"), individually and on behalf of all others similarly situated, make the following allegations and claims against U.S. Bank N.A., Wilmington Trust, N.A., Citibank, N.A., and Deutsche Bank National Trust Company (collectively, "Defendants"), upon personal knowledge, investigation of their counsel, and on information and belief.

## I. INTRODUCTION

1. This case is related to *Snyder, et al. v. Ocwen Loan Servicing, LLC*, No. 1:14-cv-08461 (N.D. Ill.), which is pending before Judge Kennelly. The Defendants in this case are the trustees for the loans on which Ocwen Loan Servicing, LLC ("Ocwen") was collecting when it made certain automated calls in violation of the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227, *et seq.* ("TCPA"). Creditors, such as Defendants, are automatically liable for their debt collectors' violations of the TCPA. *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 642 (7th Cir. 2012), citing *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 F.C.C. Rcd. 559, 565 (Jan. 4, 2008).

2.      Plaintiffs requested leave in the *Ocwen* case to add these Defendants as parties, yet leave was denied because of the age of that case.  Plaintiffs *do not* seek double recovery for each violation of the TCPA in these related cases; instead, they seek to hold these Defendants liable for Ocwen's violations.

## II.  JURISDICTION AND VENUE

3.      This Court has jurisdiction to grant the relief sought by Plaintiffs pursuant to 47 U.S.C. § 227(b) and 28 U.S.C. § 1331.

4.      Venue is proper in this District as Ocwen resides within the District and because all Defendants do business in this District, including causing the calls at issue to be made to class members in this District in violation of the TCPA.

## III.  PARTIES

5.      Plaintiff Keith Snyder ("Plaintiff Snyder") is a natural person who resides in Aliso Viejo, California.  Plaintiff Snyder is the account holder of a cellular telephone number and, pursuant to the terms of his contract, is charged for each call within the meaning of 47 U.S.C. § 227(b)(1)(A)(iii).

6.      Plaintiff Susan Mansanarez ("Plaintiff Mansanarez") is a natural person who resides in Federal Way, Washington.  Plaintiff Mansanarez is the account holder of a cellular telephone number and, pursuant to the terms of her contract, is charged for each call within the meaning of 47 U.S.C. § 227(b)(1)(A)(iii).

7.      Plaintiff Tracee A. Beecroft ("Plaintiff Beecroft") is a natural person who resides in New London, Minnesota.  Plaintiff Beecroft is the account holder of a cellular telephone number and, pursuant to the terms of her contract, is charged for each call within the meaning of 47 U.S.C. § 227(b)(1)(A)(iii).

8.      Ocwen Loan Servicing, LLC, the defendant in case number 1:14-cv-08461, is one of the largest non-bank mortgage servicers in the United States.  Ocwen services mortgage loans in all 50 states, including Illinois.  A significant part of Ocwen's business operations are

conducted in this District.  Most importantly, Ocwen's office for receipt of payments is located in Carol Stream, Illinois.

9.　　Defendant U.S. Bank N.A. ("U.S. Bank") is a national bank headquartered at 425 Walnut Street, Cincinnati, Ohio 45202.

10.　　Defendant Wilmington Trust, N.A. ("Wilmington") is a national association headquartered at 1100 North Market Street, Wilmington, Delaware 19801.

11.　　Defendant Citibank, N.A. ("Citibank") is a national bank headquartered at 701 East 60th Street North, Sioux Falls, South Dakota 57104.

12.　　Defendant Deutsche Bank National Trust Company ("Deutsche Bank") is a nationally chartered non-depository trust company with a principal place of business located, on information and belief, at 1761 East St. Andrew Place, Santa Ana, California, 92705.

## IV.  THE TCPA

13.　　In 1991, Congress enacted the TCPA in response to a growing number of consumer complaints regarding certain telemarketing and debt collection practices.  The TCPA regulates, inter alia, the use of automated dialing systems.  Specifically, section 227(b)(1)(A)(iii) prohibits the use of autodialers to make any call to a wireless number in the absence of an emergency or the prior express consent of the called party.  The TCPA's definition of an automatic telephone dialing system includes a "predictive dialer." *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 638-9 (7th Cir. 2012).

14.　　According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.  The FCC also recognized that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used.  *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14115 ¶ 165 (2003).

15.     On January 4, 2008, the FCC issued a Declaratory Ruling confirming that autodialed calls and calls using an artificial voice or prerecorded message to a wireless number by a creditor or on behalf of a creditor are permitted only if the calls are made with the "prior express consent" of the called party.  *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559, 2008 WL 65485 (2008) ("FCC Declaratory Ruling").

16.     The FCC "emphasize[d] that prior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed."  FCC Declaratory Ruling, 23 F.C.C. Rcd. at 564-65 (¶ 10).

17.     Under the TCPA, and pursuant to the FCC's January 2008 Declaratory Ruling, the burden is on Defendants to demonstrate that Plaintiffs gave their express consent to Defendants to use an autodialer to call their cell phones within the meaning of the statute.  *See* FCC Declaratory Ruling, 23 F.C.C. Rcd. at 565 (¶ 10).

## V.  FACTUAL ALLEGATIONS

### A.     Factual Allegations Regarding Ocwen

18.     Directly as well as through its subsidiaries, contractors, and agents, Ocwen employs hundreds of persons at various call centers throughout the country.  These calling centers use automatic telephone dialing systems and computerized account information to track, record, and maintain the hundreds of thousands of debts collected by Ocwen.

19.     A significant portion, if not a majority, of Ocwen's business operations are dedicated to servicing consumer loans that are in default, foreclosure, have been charged off by the original lender, or are subject to discharge in bankruptcy.

20.     Ocwen's regular business practices include making repeated telephone calls, as well as sending notices, statements, bills, and other written correspondence to persons it believes responsible for paying past-due accounts.

- 4 -

21.     Part of Ocwen's strategy for servicing consumer loans involves the use of an automatic telephone dialing system ("ATDS") and/or automated or prerecorded messages.

22.     Ocwen uses ATDS equipment and software that has the capacity to store or produce telephone numbers to be called and which includes autodialers and predictive dialers.

23.     Ocwen makes calls using an ATDS and/or artificial or prerecorded voice to cellular telephones whose owners have not provided prior express consent to receive such calls.

24.     Plaintiffs, and the other members of the Classes defined below, have each suffered a particularized and concrete injury-in-fact from Defendants' calls. These calls temporarily seized and trespassed on the use of their cellular telephones, and were an annoyance and nuisance. The calls invaded the recipient's privacy, and caused Plaintiffs and Class members to waste time and divert attention away from other activities to address them. *See, e.g., Mims v. Arrow Fin. Servs., Inc.*, 132 S. Ct. 470 (2012) (discussing congressional findings of consumer "outrage" as to autodialed and prerecorded calls). These calls also depleted the called party's cellular telephone battery, including not only as a result of the calls themselves, but in responding to them, as well—requiring an albeit small but real monetary expense in relation to the electricity needed to recharge for such depletion.

**B.     Factual Allegations Regarding Plaintiff Snyder**

25.     Plaintiff Snyder is the account holder with AT&T Mobility for cellular service and has a telephone number assigned to that account ending in 7690 (the "7690 Number").

26.     In 2001, Plaintiff Snyder purchased a home in Las Vegas, Nevada, located on Lido Isle Court (the "Las Vegas Home"). In 2006, he refinanced his mortgage and took out two loans, the first with Countrywide Home Loans ("Countrywide") and a second junior-position Home Equity Line of Credit (the "HELOC" loan) with Greenpoint Mortgage Funding ("Greenpoint"). Both loans were secured by deeds of trust. The HELOC had an approximate principal balance of $100,000. He made timely payments in full for several months, but due to a

significant and unexpected drop in his income could not afford to continue to make payments on either loan.

27.     In April 2007, Plaintiff Snyder made his last payment on both loans and the senior creditor began the process of non-judicial foreclosure as permitted under Nevada law.

28.     On or about January 18, 2008, the Las Vegas Home was sold at a trustee's sale for $625,727.34, fully satisfying the first mortgage obligation of $585,504.56 and leaving at least forty thousand dollars (specifically $40,222.78) to pay towards the HELOC. The outstanding debt on the HELOC at the time of foreclosure was $99,968.08 inclusive of late fees and other charges.

29.     Plaintiff Snyder received no communication from any creditor regarding the HELOC for more than eighteen months after the foreclosure.

30.     In early August 2009, Plaintiff Snyder received a notice from a new servicer informing him that the right to collect payments on the HELOC had been transferred from Greenpoint to the new servicer and stating that the payoff balance on the debt was $126,049.08—far in excess of the principal amount at the time of foreclosure and reflecting no credit at all for funds received from the foreclosure sale.

31.     By letter dated July 11, 2014, Ocwen notified Plaintiff Snyder that the servicing rights had been transferred to it.

32.     Defendant U.S. Bank serves as the trustee for the HELOC loan serviced through Ocwen.

33.     In mid-July of 2014, almost immediately after Ocwen acquired the servicing rights to the HELOC, Ocwen began calling Plaintiff Snyder on his cellular telephone (the 7690 Number).

34.     Ocwen's calls to Plaintiff Snyder at the 7690 Number were made using an Aspect dialer, which is an ATDS under the TCPA.

35.     Ocwen's calls to Plaintiff Snyder at the 7690 Number were made on behalf of, and at the direction of, Defendant U.S. Bank.

36.     At no time did Plaintiff Snyder list the 7690 Number on an application for credit with Countrywide or Greenpoint for the simple reason that he did not have the number when he applied for the mortgage loans.  Plaintiff Snyder was assigned the 7690 Number in 2012, so it would have been impossible in 2006 to have listed that number on his original application for credit.

37.     Plaintiff Snyder is informed and believes and, on that basis, alleges that Ocwen makes a regular business practice of using "skip tracing" methods such as pulling credit histories and searching publicly available databases to obtain contact information for persons it believes are obligated for consumer debts it services.

38.     Plaintiff Snyder believes that Ocwen obtained the 7690 Number via skip tracing and included it in its automated telephone dialing system's database.

39.     At no time did Ocwen or any predecessor in interest have Plaintiff Snyder's express consent to use an ATDS and/or artificial or prerecorded voice to call him at the 7690 Number.

40.     Many of the calls Ocwen placed to Plaintiff Snyder at the 7690 Number were made using an artificial and/or prerecorded voice.

41.     On at least one occasion, when Plaintiff Snyder answered the telephone, he heard a message stating that the call was intended to reach Keith Snyder about "an important business matter" and inviting him to press one of an enumerated list of digits to reach a particular department.

42.     Plaintiff Snyder tried to connect with a live staffer but the call terminated.

43.     When Plaintiff Snyder called back using the Caller ID as listed, (877) 746-2936 (the same number as listed on the written communications he received from Ocwen), he was

again confronted with a telephone voice message tree, which terminated his call before he could connect with a live staffer.

44.     Plaintiff Snyder sent email messages to the address listed on the written communications disputing the debt and asking the calls to stop.

45.     Ocwen made at least three more calls to Plaintiff Snyder at the 7690 Number using an identical automated and/or prerecorded message.

46.     Plaintiff Snyder believes that Ocwen placed additional calls to the 7690 Number that were not preserved and seeks discovery to identify those additional calls.

47.     Plaintiff Snyder never listed the 7690 Number in or on any documents during a transaction with Defendant U.S. Bank, Ocwen, or any creditor, nor did he subsequently give his express consent to receive calls at the 7690 Number.

48.     At no time did Plaintiff Snyder consent to receiving calls using an ATDS and/or artificial or prerecorded voice.

49.     Defendant U.S. Bank is responsible, either directly or indirectly, for making the above-described ATDS and/or artificial or prerecorded calls.

50.     In calling Plaintiff Snyder, or in causing calls to be made to Plaintiff Snyder, on his cellular telephone line multiple times at various times per day using an ATDS and without his consent, Defendant U.S. Bank violated 47 U.S.C. § 227(b).

51.     Ocwen and Defendant U.S. Bank intend to continue to make similar ATDS and/or artificial or prerecorded calls to persons on their cellular telephones throughout the entire United States.

**C.     Factual Allegations Regarding Plaintiff Mansanarez**

52.     Plaintiff Mansanarez is the account holder with T-Mobile for cellular service and has a telephone number assigned to that account ending in 7110 (the "7110 Number").

53.     In approximately 1995, Plaintiff Mansanarez began renting a home in Federal Way, Washington, located on 7th Avenue Southwest ("Federal Way Home").

54.     In approximately 2006, Plaintiff Mansanarez purchased the Federal Way Home.

55.     In approximately January 2014, Ocwen notified Plaintiff Mansanarez that the servicing rights for the Federal Way Home had been transferred to it.

56.     On information and belief, Defendant Citibank served as the trustee for the loan serviced through Ocwen, with Defendant Wilmington as its successor trustee.

57.     In approximately January of 2014, almost immediately after Ocwen acquired the servicing rights to the Federal Way Home, Ocwen began calling Plaintiff Mansanarez on her cellular telephone (the 7110 Number).

58.     Many of the calls Ocwen placed to Plaintiff Mansanarez at the 7110 Number were made using an ATDS and/or artificial or prerecorded voice.

59.     On many occasions in 2014 and 2015, Plaintiff Mansanarez requested that Ocwen cease calling her on the 7110 Number.

60.     Plaintiff Mansanarez received many calls on the 7110 Number more than 31 days after requesting that Ocwen cease calling her.

61.     During one call, Plaintiff Mansanarez asked the Ocwen representative why the company continued to call her cellular telephone.

62.     The Ocwen representative responded by explaining that her number had been placed in their automated calling system.

63.     Plaintiff Mansanarez demanded that the Ocwen representative remove the 7110 Number from their automated calling system.

64.     Ocwen, however, continued to place calls to Plaintiff Mansanarez at the 7110 Number using an ATDS and/or artificial or prerecorded voice.

65.     Ocwen's calls to Mansanarez were made using an Aspect dialer, which is an ATDS under the TCPA.

66.     On information and belief, Ocwen's calls to Mansanarez were made on behalf of, and at the direction of, Defendants Citibank and its successor, Wilmington.

67.     Consequently, Defendants Citibank and Wilmington are responsible, either directly or indirectly, for making the above-described ATDS and/or artificial or prerecorded calls.

68.     In calling Plaintiff Mansanarez, or causing calls to be made to Plaintiff Mansanarez, on her cellular telephone line multiple times at various times per day using an ATDS and without her consent, Defendants Citibank and Wilmington violated 47 U.S.C. § 227(b).

69.     On information and belief, Ocwen and Defendant Wilmington intend to continue to make similar ATDS and/or artificial or prerecorded calls to persons on their cellular telephones throughout the entire United States.

**D.     Factual Allegations Regarding Plaintiff Beecroft**

70.     Plaintiff Beecroft has at all relevant times been the account holder with Boost Mobile for cellular service and has a telephone number assigned to that account ending in 5370 (the "5370 Number").

71.     On December 23, 2005, Plaintiff Beecroft and her husband executed a promissory note to Ameriquest Mortgage Company ("Ameriquest").  The note was secured by a mortgage encumbering Plaintiff Beecroft's residence in New London, Minnesota ("New London Home").

72.     In 2008, as a result of financial difficulty, Plaintiff Beecroft stopped making her payments, and the loan went into default.

73.     In March 2009, the loan was assigned to Defendant Deutsche Bank National Trust Company.

74.     In March 2009, Deutsche Bank commenced a foreclosure by advertisement on Plaintiff Beecroft's home, later advertising a sheriff's sale in September 2009.

75.     In May 2009, Plaintiff Beecroft filed for Chapter 7 bankruptcy protection.  The loan Ameriquest assigned to Defendant Deutsche Bank was included in her bankruptcy petition.

The court ordered a discharge on August 18, 2009. On this date, Plaintiff was no longer personally obligated to pay back the loan.

76.     Plaintiff Beecroft did not sign a reaffirmation agreement for the loan.

77.     In October 2009, Plaintiff Beecroft and her husband filed a quiet title action against Deutsche Bank. After litigation and an appeal, Plaintiff Beecroft's quite title action was dismissed.

78.     On November 11, 2009, a Sheriff's Certificate of Foreclosure Sale was filed with the Kandiyohi County Recorder. The document indicated that the property was sold at auction to Defendant Deutsche Bank and was signed by Dan Hartog, the Kandiyohi County Sheriff.

79.     On information and belief, on or around April 1, 2013, Ocwen received Plaintiff Beecroft's loan for servicing on behalf of Defendant Deutsche Bank, even though the loan had been discharged in bankruptcy and a foreclosure auction completed.

80.     Immediately thereafter, Ocwen began attempting to collect the alleged balance due on the mortgage, despite Plaintiff Beecroft having no remaining legal obligation to pay the mortgage.

81.     Ocwen's collection efforts included letters, billing statements, and repeated robocalls to Plaintiff Beecroft's cellular and home telephones.

82.     On information and belief, on or around April 29, 2013, Ocwen obtained Plaintiff Beecroft's cellular telephone number by accessing Plaintiff Beecroft's Experian credit report.

83.     Between October 1, 2013 and February 1, 2014, Ocwen made approximately 58 calls to Plaintiff Beecroft's cellular telephone using an ATDS in an attempt to collect the alleged balance due on the loan from Plaintiff Beecroft.

84.     The calls violated the TCPA and were an invasion of Plaintiff Beecroft's privacy.

85.     For example, Ocwen used an ATDS to call Plaintiff Beecroft's cellular telephone number at approximately 8:26 a.m. on October 18, 2013, 8:27 a.m. on October 18, 2013, 8:04 a.m. on October 20, 2013, 8:38 a.m. on October 21, 2013, 7:19 p.m. on October 21, 2013, 8:34

a.m. on October 22, 2013, 8:31 a.m. on October 23, 2013, 8:23 a.m. on October 24, 2013, 8:30 a.m. on October 25, 2013, 8:20 a.m. on October 26, 2013, 11:02 a.m. on October 27, 2013, 8:13 a.m. on October 28, 2013, 8:07 a.m. on October 29, 2013, 8:16 a.m. on October 30, 2013, 8:21 a.m. on November 1, 2013, 8:04 a.m. on November 2, 2013, 8:10 a.m. on November 3, 2013, 9:19 a.m. on November 5, 2013, 9:02 a.m. on November 6, 2013, 8:44 a.m. on November 7, 2013, 8:58 a.m. on November 8, 2013, 8:30 a.m. on November 11, 2013, 8:22 a.m. on November 12, 2013, 11:09 a.m. on November 13, 2013, 6:29 p.m. on November 15, 2013, 8:10 a.m. on November 16, 2013, 11:27 a.m. on November 17, 2013, 12:37 p.m. on November 18, 2013, 8:30 a.m. on November 19, 2013, 11:12 a.m. on November 20, 2013, 11:27 a.m. on November 21, 2013, 11:08 a.m. on November 22, 2013, 8:01 a.m. on November 23, 2013, 12:26 p.m. on November 25, 2013, 11:07 a.m. on November 26, 2013, 10:25 a.m. on November 27, 2013, 11:05 a.m. on November 29, 2013, 1:14 p.m. on December 1, 2013, 11:49 a.m. on December 2, 2013, 11:07 a.m. on December 3, 2013, 8:04 a.m. on December 6, 2013, 8:04 a.m. on December 7, 2013, 3:05 p.m. on December 8, 2013, 12:30 p.m. on December 9, 2013, 1:07 p.m. on December 11, 2013, 1:11 p.m. on December 16, 2013, 12:22 p.m. on December 17, 2013, 12:52 p.m. on December 24, 2013, 9:43 a.m. on December 26, 2013, 10:07 a.m. on December 28, 2013, 11:00 a.m. on December 29, 2013, 11:21 a.m. on January 5, 2014, 10:47 a.m. on January 7, 2014, 11:12 a.m. on January 10, 2014, 9:39 a.m. on January 11, 2014, 9:10 a.m. on January 12, 2014, 1:25 .m. on January 13, 2014, and 9:50 a.m. on January 16, 2014.

86.    All of the calls Ocwen made to Plaintiff Beecroft's cellular telephone described in the foregoing paragraph used the caller ID "800-746-2936."

87.    Plaintiff Beecroft answered approximately two calls from Ocwen.

88.    After Plaintiff Beecroft answered the calls, there was a significant delay before an operator would come onto the line and ask for Plaintiff.

89.    This delay indicated to Plaintiff Beecroft that Ocwen used an automated dialer to make the calls.

90. Plaintiff Beecroft told Ocwen's employees to stop calling her on two occasions.

91. On information and belief, some or all of the calls to Plaintiff Beecroft's cellular telephone, including, but not limited to, the calls listed above, were made using: (a) a Premier Global Dialer; (b) an IAT Predictive Dialer; (c) a Davox Dialer; (d) an Aspect Dialer; or (e) a similar dialing system that has the requisite capacity pursuant to the TCPA.

92. Ocwen's calls to Beecroft were made on behalf of, and at the direction of, Defendant Deutsche Bank.

93. Defendant Deutsche Bank is responsible, either directly or indirectly, for making the above-described ATDS and/or artificial or prerecorded calls.

94. In calling Plaintiff Beecroft, or causing calls to be made to Plaintiff Beecroft, on her cellular telephone line multiple times at various times per day using an ATDS and without her consent, Defendant Deutsche Bank violated 47 U.S.C. § 227(b).

95. Ocwen and Defendant Deutsche Bank intend to continue to make similar ATDS and/or artificial or prerecorded calls to persons on their cellular telephones throughout the entire United States.

96. Defendants knew about the TCPA, but caused the calls alleged herein to be made in spite of such knowledge.

**E.    Factual Allegations Regarding Defendants**

97. The TCPA imposes liability upon any person who makes unlawful phone calls using an autodialer or a prerecorded message. The FCC—which Congress vested with the authority to promulgate rules and regulations implementing the TCPA, *see* 47 U.S.C. § 227(b)(2) —has declared through rulemaking and adjudicative orders that liability for a TCPA violation may be imputed to a party that did not itself place the unlawful calls if the party that placed the calls did so as an agent of that party.

98. To ensure that creditors and debt collectors call only those consumers who have consented to receive autodialed or prerecorded message calls, the *creditor* is responsible under

the TCPA for demonstrating that the consumer provided prior express consent to be called. *FCC Declaratory Ruling*, 23 F.C.C. Rcd. 559 (¶ 10).

99. Hence, a creditor on whose behalf an autodialed or prerecorded message call is made to a wireless number bears the responsibility for any resulting violation of the TCPA. Calls placed by a third-party collector on behalf of that creditor are treated as if the creditor itself placed the call. *Id.*

100. Alternatively, an entity may be held vicariously liable for violations of the TCPA "under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification." *In re Joint Petition filed by Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6528 ¶ 28 (2013).

101. Here, Defendants U.S. Bank, Wilmington, Citibank, and Deutsche Bank expressly authorized Ocwen to act as their agent for servicing the respective loans in the trust pools, and specified in detail how Ocwen was to carry out that authority in writing, starting with the Pooling and Servicing Agreement ("PSA") for each trust.

102. Ameriquest Mortgage Company was originally the Master Servicer for the 2006-R1 Trust associated with Plaintiff Beecroft's loan as to the New London Home, but Ocwen succeeded to that role on March 10, 2013 when it acquired the servicing rights. According to the applicable PSA, Ocwen succeeds to the duties of the Master Servicer under the PSA "without the execution or filing of any paper or any further act on the part of any of the parties hereto" so long as Ocwen is qualified to service mortgage loans on behalf of Fannie Mae or Freddie Mac. Ameriquest 2006-R1 PSA, § 6.02.

103. Defendant Deutsche Bank serves as trustee for the Ameriquest Mortgage Securities Inc. asset-backed, pass-through certificates Series 2006-R1.

104. On information and belief, Greenpoint Mortgage Funding, Inc. was the original Master Servicer for the Greenpoint Mortgage Funding Trust 2005-HE2, which holds Plaintiff Snyder's promissory note, but Ocwen succeeded to that role on July 1, 2014.

105.    Defendant U.S. Bank serves as trustee for the Series 2005-HE2 Certificates, including as to Plaintiff Snyder's HELOC loan.

106.    On information and belief, Wells Fargo Bank, N.A. was the original servicer for the Bear Stearns ALT-A Trust mortgage pass-through certificates, Series 2006-4, which holds Plaintiff Mansanarez' promissory note, but Ocwen succeeded to that role on July 1, 2014.

107.    Defendants Citibank and Wilmington served as trustees for the Series 2006 Certificates during the relevant time period including, on information and belief, as to Plaintiff Mansanarez' loan.

108.    The trustee of each Defendant has broad authority over the Master Servicer.  For example, the PSA for the trust which owns Plaintiff Beecroft's promissory note specifies that the trustee has the right to access records and demand financial statements from the Master Servicer, as well as any sub-servicer hired by the Master Servicer.  Ameriquest 2006-R1 PSA § 6.05.

109.    Ocwen, as the Master Servicer under each PSA, is responsible for making payments to the trust and making detailed, regular reports.  For example, the PSA for the trust which owns Plaintiff Beecroft's promissory note specifies that the Master Servicer must make a "remittance report" on each distribution date breaking down the advances made, the aggregate amount of nonrecoverable advances, a statement of the collection account, the aggregate amount of deposits in the collection account, and other information relating to the performance of the loans in the trust.  Ameriquest 2006-R1 PSA § 4.03(a).  The PSA for the trust which owns Plaintiff Mansanarez' promissory note has similar duties for the Master Servicer, specifying (among other things) that the Master Servicer must make monthly reports that reconcile the actual payments made with the anticipated payments.  BSALTA 2006-4 PSA § 3.01.

110.    Each Defendant has required Ocwen as the Master Servicer for the respective loan pool to make an annual compliance statement and have responsible officers sign that document.

111.    Each Defendant expressly delegated to Ocwen the responsibility to collect money owed under the promissory notes that it owns and holds.  Sometimes this delegation is set out in

the PSA, for example in Ameriquest 2006-R1 PSA, § 3.02 ("The Master Servicer shall make reasonable efforts to collect all payments called for under the terms and provisions of the Mortgage Loans.").  And sometimes the delegation is described in ancillary documents provided under federal regulations when the sponsor of the deal made a securities offering.  "As part of its servicing duties, the master servicer will be required to, and to cause each of the [sub-]servicers to, make reasonable efforts to collect all payments called for under the terms and provisions of the mortgage loans that it services."  BSALTA 2006-4 Prospectus, at 23 (Form 424B5, filed July 18, 2006 with Securities and Exchange Commission).

112.    Ocwen is also expressly given authority by each PSA to foreclose on a property securing a loan in the event of default by the borrower, passing the proceeds along to the trust. *See, e.g.,* BSALTA 2006-4 PSA § 3.05.  But when it does foreclose, each PSA requires that title to the property be held in the name of the trust, not in Ocwen's own name—further evidence that each Defendant exercises control over its agents activities and the authority delegated is far from plenary.  *See, e.g*., Ameriquest 2006-R1 PSA, § 3.13(a) ("The deed or certificate of sale of any REO Property shall be taken in the name of the Trustee, or its nominee, in trust for the benefit of the Certificateholders.").

113.    At least one PSA expressly states that the mortgage loan files and funds collected by the Master Servicer "shall be and remain the sole and exclusive property of the Trustee" even though held by the Master Servicer. BSALTA 2006-4 PSA § 3.08(b); Ameriquest 2006-R1 PSA § 3.17(b) ("the Master Servicer shall retain such Mortgage File in trust for the benefit of the Certificateholders").

114.    Not only is Ocwen the express, formal agent for each Defendant, but each Defendant also ratified Ocwen's actions by accepting the benefit of Ocwen's collection activities.  Ratification occurs when an agent acts for a principal's benefit and the principal does not repudiate the agent's actions.  *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co*., 376 F.3d 664, 677 (7th Cir. 2004).

- 16 -

115. In addition to the PSAs, the course of dealings between Ocwen and Defendants shows that Defendants knowingly accepted the benefits of the challenged calls.

116. For example, but not by limitation, at no time did any trustee or authorized agent of any Defendant refuse to accept the funds obtained by Ocwen as a result of its collection efforts. In fact, the Defendants actively and knowingly accepted the benefits of Ocwen's calls, in spite of their knowledge that the calls were illegal. Such acceptance of benefits continued even after this lawsuit was filed.

117. At no time did any trustee or authorized agent of any Defendant terminate or modify Ocwen's servicing authority due to Ocwen's collection methods or procedures, even though Ocwen had been sued more than one hundred times for violating state and federal consumer protection laws relating to collection methods and procedures in the years prior to the filing of this action.

118. Indeed, so accepting has each Defendant been of Ocwen's performance that even when Ocwen was the subject of multiple enforcement actions by state regulators in New York and California, no Defendant sought to terminate Ocwen's master servicing authority.

## VI. CLASS ACTION ALLEGATIONS

119. Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23(b)(3) individually and behalf of all others similarly situated. Plaintiffs seek to represent the below three (3) classes:

> U.S. Bank Class (Snyder is the proposed class representative): All persons whose cellular telephones Ocwen called using its Aspect dialer in relation to a loan for which U.S. Bank was serving as trustee.

> Wilmington Class (Mansanarez is the proposed class representative): All persons whose cellular telephones Ocwen called using its Aspect dialer in relation to a loan for which Wilmington was serving as trustee.

> Citibank Class (Mansanarez is the proposed class representative): All persons whose cellular telephones Ocwen called using its

Aspect dialer in relation to a loan for which Citibank was serving as trustee.

Deutsche Class (Beecroft is the proposed class representative): All persons whose cellular telephones Ocwen called using its Aspect dialer in relation to a loan for which Deutsche Bank was serving as trustee.

The U.S. Bank Class, Wilmington Class, Citibank Class, and Deutsche Class are hereinafter collectively referred to as the "Classes." Excluded from the Classes are Defendants and any entities in which Defendants or their subsidiaries or affiliates have a controlling interest, Defendants' agents and employees, the judicial officer to whom this action is assigned and any member of the court staff and immediate family, and claims for personal injury, wrongful death, and emotional distress.

120.     Numerosity.  Plaintiffs do not know the exact number of members in the Classes, but, based on Defendants' public statements regarding their business in the United States and investigation of their counsel, Plaintiffs reasonably believe that Class members for the proposed classes and subclasses number in the tens of thousands, if not more.

121.     Commonality.  There are questions of law and fact common to the members of the Classes that predominate over any questions affecting only individual members.   These common questions of law and fact include, but are not limited to, the following:

a.      Whether Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf violated 47 U.S.C. § 227(b)(1)(A) by making any call, except for emergency purposes, to a cellular telephone number using an ATDS or an artificial or prerecorded voice;

b.      Whether Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf knowingly and/or willfully violated 47 U.S.C. § 227(b)(1)(A) by making any call, except for emergency purposes, to a cellular telephone number using an ATDS or artificial or prerecorded voice, such that treble damages are appropriate under 47 U.S.C. § 227(b)(3);

c.      Whether Defendants are liable for autodialed or prerecorded voice debt collection calls made by Defendants' affiliates, agents, and/or other persons or entities acting on Defendants' behalf; and

d.      Whether Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf should be enjoined from violating the TCPA in the future.

122.    <u>Typicality</u>.  Plaintiffs' claims are typical of the claims of the Classes.  Plaintiffs' claims, like the claims of Classes arise out of the same common course of conduct by Defendants and are based on the same legal and remedial theories.

123.    <u>Adequacy</u>.  Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs have retained competent and capable attorneys with significant experience in complex and class action litigation, including consumer class actions and TCPA class actions. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so.  Neither Plaintiffs nor their counsel have interests that are contrary to or that conflict with those of the proposed Classes.

124.    <u>Predominance</u>.  Defendants have engaged in a common course of conduct toward Plaintiffs and members of the Classes.  The common issues arising from this conduct that affect Plaintiffs and members of the Classes predominate over any individual issues.  Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

125.    <u>Superiority</u>. A class action is superior to all other available methods for the fair and efficient adjudication of the controversy for the following reasons:

a.      It is economically impractical for members of the Classes to prosecute individual actions;

b.      The Classes are readily definable; and

c.      Prosecution as a class action will eliminate the possibility of repetitious litigation.

126.    A class action will cause an orderly and expeditious administration of the claims of the Classes.  Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

127.    Class-wide relief is essential to compel Defendants to comply with the TCPA. The interest of Class members in individually controlling the prosecution of separate claims against Defendants is small because the statutory damages in an individual action for violation of the TCPA are small.  Management of these claims is likely to present significantly fewer difficulties than are presented in many class claims because the calls at issue are all automated and the Class members, by definition, did not provide the prior express consent required under the statute to authorize calls to their cellular telephones.

128.    <u>Injunctive and Declaratory Relief Appropriate</u>.  Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief and corresponding declaratory relief with respect to the Classes appropriate on a class-wide basis. Moreover, on information and belief, Plaintiffs allege that the automated calls made by Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf that are complained of herein are substantially likely to continue in the future if an injunction is not entered.

## VII.  COUNT I
### (Violations of the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii))

129.    Plaintiffs re-allege and incorporate by reference the above paragraphs as though set forth fully herein.

130.    The foregoing act and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute numerous and multiple violations of the TCPA, including but not limited to each of the above-cited provisions of 47 U.S.C. § 227, by making calls, except for emergency purposes, to the cellular telephone numbers of Plaintiffs and members of the Classes using an ATDS and/or artificial or prerecorded voice.

- 20 -

131.     As a result of Defendants' and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf's violations of the TCPA, Plaintiffs and members of the Classes are entitled to an award of $500 in statutory damages for each and every call placed in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3).

132.     Plaintiffs and all members of the Classes are also entitled to and do seek injunctive relief prohibiting such conduct that violates the TCPA by Defendants in the future, pursuant to 47 U.S.C. § 227(b)(3).

## VIII.  COUNT II

### (Knowing and/or Willful Violations of the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii))

133.     Plaintiffs re-allege and incorporate by reference the above paragraphs as though set forth fully herein.

134.     The foregoing acts and omissions of Defendants constitute numerous and multiple knowing and/or willful, violations of the TCPA, including, but not limited to, each of the above-cited provisions of 47 U.S.C. § 227, by making calls, except for emergency purposes, to the cellular telephone numbers of Plaintiffs and members of Classes using an ATDS and/or an artificial or prerecorded voice.

135.     As a result of Defendants' knowing and/or willful violations of the TCPA, Plaintiffs and each member of the Classes are entitled to treble damages of up to $1,500 for each and every call in violation of the statute, pursuant to 47 U.S.C. § 227(b)(3).

136.     Plaintiffs and all members of the Classes are also entitled to and do seek injunctive relief prohibiting such willful conduct that violates the TCPA by Defendants in the future, pursuant to 47 U.S.C. § 227(b)(3).

## IX.  JURY TRIAL DEMAND

Plaintiffs demand a jury trial on each of the causes of action set forth above, including the amount of statutory damages.

## X.  PRAYERS FOR RELIEF

Wherefore, Plaintiffs respectfully pray that judgment be entered against Defendants, for the following:

A.    Certification of the proposed Classes;

B.    An injunction against further violations;

C.    Damages pursuant to 47 U.S.C. § 227(b)(3);

D.    Costs of suit and reasonable attorneys' fees pursuant to statute and/or as part of a common fund, if any;

E.    Appointment of Plaintiff Snyder as representative of the U.S. Bank Class;

F.    Appointment of Plaintiff Mansanarez as representative of the Wilmington Class;

G.    Appointment of Plaintiff Mansanarez as representative of the Citibank Class;

H.    Appointment of Plaintiff Beecroft as representative of Deutsche Class;

I.    Appointment of the undersigned counsel as counsel for the Classes;

J.    A declaration that Defendants and/or their affiliates, agents, and/or other related entities' actions complained of herein violate the TCPA;

K.    Leave to amend this Complaint to conform to the evidence presented at trial; and

L.    Such other and further relief the Court deems reasonable and just.

Respectfully submitted,

Dated:      December 28, 2016

KEITH SNYDER, SUSAN MANSANAREZ, and TRACEE A. BEECROFT, individually and on behalf of all others similarly situated

By:  /s/ Alexander H. Burke
    Alexander H. Burke
    Email:  aburke@burkelawllc.com
    Daniel J. Marovitch
    Email:  dmarovitch@burkelawllc.com
    BURKE LAW OFFICES, LLC
    155 N. Michigan Ave., Suite 9020
    Chicago, Illinois 60601
    Telephone:  (312) 729-5288
    Facsimile:  (312) 729-5289

Mark Ankcorn, N.D. Illinois #1159690
Email:  mark@ankcorn.com
ANKCORN LAW FIRM, PC
11622 El Camino Real, Suite 100
San Diego, California 92130
Telephone:  (619) 870-0600
Facsimile:  (619) 684-3541

    <u>Local Office</u>:
    1608 South Ashland Avenue, #92015
    Chicago, Illinois  60608-2013

Guillermo Cabrera
Email:  gil@cabrerafirm.com
Jared Quient
Email:  jared@cabrerafirm.com
THE CABRERA FIRM, APC
600 West Broadway, Suite 700
San Diego, California 92101
Telephone:  (619) 500-4880
Facsimile:  (619) 785-3380

Beth E. Terrell
Email:  bterrell@terrellmarshall.com
Adrienne D. McEntee
Email:  amcentee@terrellmarshall.com
TERRELL MARSHALL LAW
  GROUP PLLC
936 N. 34th Street, Suite 300
Seattle, Washington 98103
Telephone:  (206) 816-6603
Facsimile:  (206) 319-5450

*Attorneys for Plaintiffs*